Filed 9/22/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LINDA KAHN, | |
| Plaintiff and Respondent, | A159536 |
| v. | |
| KATHERINE PRICE et al., | (City and County of San Francisco Super. Ct. No. CGC18564579) |
| Defendants and Appellants. | |
| LINDA KAHN, | A160057 |
| Plaintiff and Respondent, | |
| v. | (City and County of San Francisco Super. Ct. No. CGC18564579) |
| KATHERINE PRICE et al., | |
| Defendants and Appellants; | |
| WILLIAM S. WEISBERG et al., | |

---

\*    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the following portions of the Discussion: Section II (Trial Court's Order Directing Tree Removal) and Section III (Trial Court's Imposition of Section 128.5 Sanctions).

Objectors and Appellants.

This lawsuit concerns the parties' long-standing dispute concerning the presence of a Monterey pine tree ("the tree") growing in the rear yard of the property owned by defendants and appellants Katherine and Richard Price (the Prices). The tree obstructs plaintiff and respondent Linda Kahn's views of the San Francisco Bay and Marin County from the main level of her residence.

Kahn sought declaratory and injunctive relief available under the San Francisco Tree Dispute Resolution Ordinance ("Ordinance"; S.F. Pub. Works Code, art. 16.1, §§ 820, et seq.[1]), which creates "rights in favor of private property owners" to restore their "views lost due to tree growth" on adjoining property. (*Id*., §§ 821, subd. (a)(1), 827.) Following a bench trial, the court entered an amended judgment in favor of Kahn, declaring her right to the restoration of the views that "are now obstructed by the Monterey pine tree" and directing the tree's

---

[1] On December 1, 2020, we granted the Prices' request to take judicial notice of the Ordinance. San Francisco Tree Dispute Resolution Ordinance sections are hereafter referred to as "Ordinance section . . . ."

2

removal.  The court also granted Kahn's request for Code of Civil Procedure[2] section 128.5 sanctions in the sum of $47,345.30, payable by the Prices and their trial counsel William S. Weisberg and the law firm of Weisberg & Miller, jointly and severally.

We see no merit to the Prices' arguments that the lawsuit was barred by the statute of limitations, that dismissal is required for Kahn's failure to comply with the Ordinance's prelitigation procedures, or that the trial court erred in directing the tree's removal.  We also see no merit to the challenge by the Prices and their trial counsel to the award of sanctions against them.  Accordingly, we affirm the amended judgment.[3]

---

[2]     All undesignated statutory references are to the Code of Civil Procedure.

[3]     The Prices filed a notice of appeal from a judgment filed December 2, 2019 (case No. A159536) and an amended notice of appeal from an amended judgment filed February 26, 2020, as well as separate February 25, 2020, orders awarding costs, attorney and expert fees, and sanctions in favor of Kahn (incorporated in the amended judgment), and a separate February 26, 2020, order denying their motion for sanctions against Kahn and her trial counsel (case No. A160057).  William S. Weisberg and the firm of Weisberg & Miller are named as additional appellants in the amended notice of appeal filed in case No. A160057.  On the court's own motion, we consolidated the appeals in case No. A159536 and case No. A160057 for purposes of oral argument and disposition.

The appeal from the February 26, 2020 order denying the Prices' motion for sanctions against Kahn and her trial counsel is dismissed as no appeal lies from that order.  (*Wells Properties v. Popkin* (1992) 9 Cal.App.4th 1053, 1055 ["*denial* of motion for sanctions is not a judgment and is therefore not appealable"; italics in original].)  The appeals from the December 2, 2019 judgment and the February 25, 2020 orders awarding costs, attorney and expert fees, and sanctions in favor of Kahn, are dismissed as superseded by the appeal from the February 26, 2020 amended judgment.  The issues raised on the dismissed appeals from the December 2, 2019 judgment and the

3

## FACTUAL AND PROCEDURAL BACKGROUND

We set forth the underlying facts as found by the trial court and taken in part from its statement of decision. We present additional facts in our discussion of the issues.

### A.     Background

Kahn purchased a multi-story residence in San Francisco in 1976.[4] At the time, the residence had unobstructed views from the primary living areas located on the north side of the home on the main level as well as unobstructed views from the north-facing rooms on the second and third floors. The residence's northerly and northwesterly views – of the San Francisco cityscape and Bay, the Golden Gate Bridge, Angel Island, and southern Marin County – remained unobstructed by any other vegetation or the tree until 2011.

In or about 1998, the Prices' predecessors in interest (prior owners) purchased the multi-story residence on property that is down slope from and abuts Kahn's property. The properties are separated by a structure (a retaining wall topped by a lattice fence) located 10 to 12 feet above ground level on the Kahn property; the tree is located at "the very rear" of the Prices' backyard and is adjacent to the retaining wall.

When Kahn replaced the lattice fence atop the retaining wall in 2001, she saw the origins of the tree that likely had been growing from a "volunteer seedling" since approximately 1999. The tree appeared "hedge-like" and was "well below the height of the lattice fence." By

February 25, 2020 orders are considered on the appeal from the February 26, 2020 amended judgment. (Code Civ. Proc., § 906.)

[4]     Kahn originally purchased the residence together with her late husband Paul Kahn in 1976. At the time of this litigation the residence was owned by Kahn, individually and as Trustee of the Survivor's Trust under the Paul and Linda Kahn Trust, dated November 7, 1995.

4

2007, the tree was beginning to grow above the lattice fence but did not obstruct Kahn's views.  However, by 2011 the tree was visible above the lattice fence at which time Kahn advised the prior owners that the tree was eclipsing her views.  Kahn offered to pay for the removal of the tree, but instead the prior owners trimmed the tree.

In 2012, when Kahn learned the prior owners had sold the property to the Prices, Kahn contacted the Prices in writing and in person.  The Prices, who were then living in Hong Kong and only visiting the San Francisco property occasionally, assured Kahn they would consult with their landscape architects about the tree.

"In late 2016, when it appeared informal resolution was unlikely," Kahn began the Ordinance's prelitigation procedures[5] by serving the Prices with a tree claim in early 2017[6] and the parties

---

[5] Ordinance section 823 requires the parties to participate in prelitigation procedures of "initial reconciliation" (written and if possible, in person notice of dispute) and "Community Board" mediation.  (*Id.*, subd. (a), (b).)  If the initial reconciliation fails and Community Board mediation is not elected or fails, "the complaining party must prepare a tree claim as defined in Section 822 (j), and provide a copy to the tree owner in order to pursue either binding arbitration or litigation.  This process constitutes the filing of a tree claim."  (*Id.*, subd. (c).)  "In those cases where initial reconciliation fails and binding arbitration is not elected, civil action may be pursued by the complaining party for resolution of the sunlight access or view tree claim under the provisions of the Ordinance.  The litigant must state in the complaint that arbitration was offered and not accepted."  (*Id.*, subd. (d).)

[6] The tree claim consisted of Kahn's trial counsel's letter entitled "Tree Claim by the Owner [At Specified Address]."  In the body of the letter counsel explained the nature of the dispute as known and understood by Kahn.  Kahn's counsel attached to her letter a copy of the Ordinance and a copy of a January 22, 2017 five-page report prepared by Kahn's expert arborist who testified at trial.

5

engaged in private mediation (in lieu of community board mediation under the Ordinance) in June 2017. When private mediation failed in late 2017, and the Prices declined to participate in arbitration, Kahn filed this lawsuit in early 2018 seeking declaratory and injunctive relief.

## B.    Trial Proceeding

At a bench trial held in June 2019, the court heard the testimony of the Prices, Kahn, Kahn's relative, Kahn's friend, and an immediate neighbor of Kahn and the Prices. The court also heard testimony of Kahn's expert consulting arborist and the Prices' expert consulting arborist, expert aerial photographer, expert geotechnical engineer, and real estate appraiser. The court considered extensive documentation including the parties' written communications and photographs taken at various times and from various locations within and without the parties' properties. Lastly, the court conducted an on-site inspection of the parties' properties on June 19, at which time the parties and counsel were present.[7]

The court found that since the purchase of her home in 1976 Kahn had "enjoyed" views (from all floors) of "the San Francisco cityscape, the Bay, the Golden Gate bridge, southern Marin County, and Angel Island" until 2011 when the tree began obstructing and

---

[7]    After the on-site inspection counsel put on the record that during the site inspection the participants viewed the Prices' property from the three "levels" at the back of the house and the "outdoors," and viewed Kahn's property from the three levels of the house and the backyard. The court specifically remarked that the "photographs" did not really "portray the circumstances given the difference in altitude between [the homes] and the relationship of the trees to the houses and the topography."

6

ultimately "eclipsed" the views; but for the tree, Kahn's residence would still have those unobstructed views. Under the heading, "Historic Evidence of Views," the court specifically found: "Kahn, her [relative] and [her friend], both of whom regularly visited the Kahn home, testified to the northerly views over San Francisco, San Francisco Bay, southern Marin County, and Angel Island. The views were a principal factor in the Kahns' decision to purchase the property. The testimony and historic photographs establish that, when the Kahns purchased their home, the 'views,' as defined in [Ordinance] Section 822(n), from the garden, terrace, dining room, and kitchen dining area – north facing rooms located on the main level – were unobstructed. Nor was the view obstructed from any of the north facing rooms on the upper two levels of the Kahn home. (Kahn home's historic views). The evidence also establishes that the northerly and northwesterly views of the San Francisco cityscape, the Bay, the Golden Gate bridge, southern Marin County, and Angel Island remained unobstructed by the tree or any other vegetation until at least 2011."

The trial court also considered the burdens and benefits of the tree pursuant to the Ordinance's enumerated criteria and based upon the "testimonial and documentary evidence," the court's "personal inspection of the parties' respective properties," and "the written and oral arguments of counsel."

Regarding the tree's burdens, the court found that "the Kahn home had unobstructed views from the Golden Gate to Angel Island and, but for the tree, would still have that view. There are landmarks, vistas and other unique features, including the San Francisco Bay, Angel Island, and portions of southern Marin County which would be

7

visible from the first level of the Kahn home, in the dining room and the kitchen, as well as from the patio and rear garden, but are partially or completely eclipsed by the tree's growth from 2011 to the present." The court found credible the photographic methodology used by Kahn's arborist who documented "the tree's effect and estimated the obstructions to be 50-60% from the dining room, 90% from the kitchen table, 20-30% from the rear patio, and 30-40% of [the view] from the rear yard looking north to northeast."

The court's own observations during the site visit corroborated the arborist's testimony. The court also found it was "only the tree – and not other factors – which obstruct the view and create the burdens listed in the Ordinance." In sum, the court found "overwhelming" evidence that: "the tree's rapid growth in both height and breadth obstructs the views of landmarks and vistas that could once be seen"; "[t]he degree of obstruction makes that burden significant and substantial"; and "there are no other factors contributing to the burden."[8]

---

[8] In 2017 the tree had an overall height of approximately 25 feet, but by the time of the June 2019 trial the tree was approaching approximately 30 to 32 feet in overall height and was approximately 10 to 12 feet above the lattice fence that sat atop the retaining wall separating the properties. Kahn's arborist testified that other counties had ordinances that classified the Monterey pine tree as "undesirable," because it was a fast growing, large stature tree, growing over three feet per year and reaching heights of 35 to 40 feet. At trial, Kahn's arborist described the tree's "current condition[]" as follows: When you were standing on the main level of Kahn's residence, "you have at least 3 . . . to 5 feet above the fence before you start to have an obstruction of the Bay and distant hills" from the main level of Kahn's residence. Based on photographs of the tree taken from the second level of Kahn's residence in February 2019, "the current views of the pine in that location, you can juxtaposition yourself below to show that," at least in

8

Discussing the tree's benefits, the trial court specifically found that "the tree's vigor in this context and location is not a benefit." In so concluding, the court explained that "Kahn raised concerns about the tree when it was young. Had [the Prices or their predecessors in interest] heeded her warning, when the tree was small, a skilled arborist . . . could have advised on pruning that would have maintained the unique features of the Monterey pine while limiting its intrusion on the Kahn home's historic views. Instead the tree's owners ignored her requests, while the tree grew rapidly. Then in a belated effort to ameliorate the complaint, the tree was subjected to repeated topping and trimming. The unfortunate result is the tree no longer has the visual qualities of a Monterey pine . . . . [¶] If the tree survives, unaffected by the beetles and pine-pitch canker, true to the species, it will become a very large stature tree. . . . [I]f the tree is pruned to mitigate the view-related burdens, given its growth-pattern, the effects of that pruning will be fleeting – demanding frequent attention. [The parties' immediate neighbor] testified that the tree obstructs the views of the Golden Gate Bridge and surrounding waters from his home. Even when the tree is pruned in a manner which improves – but does not restore – those views, due to rapid growth, the view obstruction recurs within a very short period of time."

In evaluating the tree's "aesthetics, a trait in the eye of the beholder," the trial court found, "[u]nderstandably, that the Prices insisted that the tree's role in their yard, and, indeed in their decision to purchase the home, is paramount. They extol its virtues in shading

the 1970s, there was no view obstruction on the main level of Kahn's residence.

9

their yard, providing a backdrop for their landscaping and assuring privacy for their family. While the court does not seek to substitute its artistic opinion for that of the homeowners, there are objective factors which cannot be ignored. The other landscaping in the Prices' yard is dwarfed by the tree. While the other trees and plants are all proportional to one another, the looming Monterey pine is disproportionate to all the surrounding vegetation and looms ominously. [¶] The tree is located at the very rear of their yard and atop a steep slope, adjacent to the retaining wall and Kahn's lattice fence. [The Prices' arborist] testified that, given [the tree's] distance from the Prices' home, it does not provide shade to either the home or the outdoor areas where the family would be dining or socializing. . . ."

On the issue of "soil stability provided by the tree," the trial court found not credible the testimony of Prices' geotechnical engineer who opined, "without any data, testing, or explanation – that removal of the tree would result in a 'landslide' affecting multiple properties." Nor did the witness "distinguish whether the 'landslide' would occur regardless whether the stump and roots were removed at the time the tree is felled, or if they were allowed to remain. [Kahn's arborist] testified that leaving the roots and stump to decompose – while planting woody vegetation which could take root while the [tree's] roots decayed – would assure soil stability. Planting along the entire length of the retaining wall would provide additional stability as it is unlikely that the tree's roots extend to the western edge of the yard." The court found no evidence that soil stability had been an issue during the decades predating the tree, and, no evidence that the retaining wall's stability depended on the tree. The court also found that, if the tree's

10

roots contributed to the soil stability, it was at most a minor benefit and one which could be secured by leaving them in place after the tree was removed and added plantings.

The trial court did find the tree provided some visual screening for the yard and the children's bedrooms in the Prices' home, allowing for "minimal privacy," but "any benefit of this screening is minor and insignificant." In so concluding, the court found unpersuasive the Prices' contention that the tree was critical to provide privacy from the Kahn residence. "The Price yard and living spaces are not visible from the main floor of the Kahn home, not because of the tree, but because of the difference in elevation and the retaining wall and fence separating the Kahn home and the Prices' home. To the extent, the tree blocks views of the Prices' home, it does so from only a portion of the upper floors of the Kahn home and therefore does not provide the 'privacy' the Prices' claim to be essential. [¶] To the extent the Prices' claimed need for privacy is sincere – rather than merely a justification for retaining the tree – the site visit provided evidence of the visibility of the Prices' yard and children's bedrooms from neighbors to the east, west, and south. The site inspection also demonstrated that the interior of the Prices' home is visible on many sides." "Neighbors in many homes – much closer than the Kahn home – can peer into the Price property, and yet the Prices have not installed window coverings to provide the privacy they claim to value." The court's own observations were "corroborated" by Kahn's arborist's "room-by-room analysis," documented by photography from the yard and interior of the Prices' home.

Having determined the tree's burdens were "overwhelming" and "the benefits the tree confers to be minimal," the court therefore concluded Kahn had met her burden of proving "the burdens posed by the tree outweighed the benefits and that restorative action is required." In deciding the appropriate type of restorative action, the court evaluated the Ordinance's "[a]ppropriate [r]estorative [a]ctions" of (i) no action, (ii) trimming, (iii) thinning, (iv) delayed trimming or thinning, (v) topping, or (vi) tree removal with possible replacement plantings. (Ord., § 824, subd. (c)(1).) The court explained its reasons for finding that the first five actions were not feasible and the sole action that best achieved the Ordinance's objectives was removal of the tree, which we will later discuss in the analysis.

The court also explained its decisions regarding the apportionment of costs between the parties. (Ord., § 825.[9]) As to costs

<hr/>

[9] Ordinance section 825, entitled "APPORTIONMENT OF COSTS," "[a]dded by Ord. 445-88, App. 9/28/88," provides in pertinent part: "(b) **Costs of Litigation**. The complaining party shall pay 100 percent of both parties' reasonable attorneys' fees in the event that his or her claim is finally denied, or no action is ordered pursuant to Section 824(c). In all other cases the complaining party and the tree owner shall each pay his or her attorney's fees. Court costs shall be allocated to the parties at the court's discretion. [¶] (c) **Costs of Restorative Actions**. At any time during the procedure specified in this ordinance the parties may agree between themselves as to the allocation of the costs of the restorative action. If such an agreement is not reached, the following shall apply: [¶] (1) As to trees planted prior to the effective date of this ordinance the complaining party shall pay 100 percent of the costs of the initial restorative action. The complaining party shall pay the cost of subsequent restorative action as a result of the recurrence of the same obstruction. [¶] (2) As to trees planted subsequent to the effective date of this chapter [sic] the tree owner and the complaining party shall each be responsible for 50

for the restorative action of tree removal, the court found the tree was not present before September 28, 1988, the effective date of the Ordinance. Consequently, the court directed that the cost of tree removal (the court-ordered restorative action) was to be paid "in equal proportion by the parties." As to litigation costs, the trial court found Kahn and the Prices were to pay their own attorney's fees pursuant to Ordinance section 825, subdivision (b), but Kahn as the prevailing party was entitled to her costs as defined in the Code of Civil Procedure.

The trial court entered judgment on December 2, 2019, later amended on February 28, 2020, in favor of Kahn "on both the cause of action for declaratory relief and the cause of action for injunctive relief" under the Ordinance. The court declared Kahn was entitled to restoration of her obstructed views, and to that end, the Prices were directed to remove the tree "so that the stump is cut to grade and the roots remain intact" and the stump was to "be treated to ensure that it will not re-sprout." The parties were to follow specific procedures in hiring a licensed, bonded, and insured tree-care company to perform and complete the tree removal. The Prices were directed to pay the tree removal company and provide Kahn with a copy of the paid invoice and proof of payment; within five court days of receipt of the paid invoice, Kahn was to pay one-half of the amount paid to the tree removal company as evidenced by the paid invoice. The Prices were granted the right to "plant replacements at their option and expense," with the proviso that they "select species which, at maturity, will not

---

percent of the costs of restorative action and subsequent recurrence of the same obstruction." (Bolded language in original.)

interfere with the Kahn home's historic views." The amended judgment also included provisions awarding Kahn (1) $69,150.65 as costs (§ 1032 [prevailing party costs]; Ord., § 825, subd. (b) [court costs allocated at court's discretion]), (2) $41,182.50 as attorney fees and expert fees (§ 2033.420 [expenses incurred in proving matters which a party to whom a request for admission was directed failed to admit]), and (3) $47,345.30 as section 128.5 sanctions, payable jointly and severally by the Prices and their trial counsel William S. Weisberg and the law firm of Weisberg & Miller.

Appellants' timely appeal ensued. [10]

## DISCUSSION

I. **Trial Court's Rulings on Statute of Limitations, Ordinance's Prelitigation Procedures, and Laches**

A. *Relevant Facts*

Before trial, the Prices sought to bifurcate the trial with phase one regarding their affirmative defense that the lawsuit was time-barred. While conceding the Ordinance contained no statute of limitations, the Prices asserted the applicable Code of Civil Procedure statute of limitations was three years for either a claim in the nature of a permanent nuisance or liability created by statute (§ 338, subds. (a), (b)), for which there were no exceptions. In opposition, Kahn argued, among other things, that her action sought abatement of a continuing nuisance for which no statute of limitations was applicable. The trial

---

[10] While the Prices seek reversal of the amended judgment in its entirety, they do not specifically challenge the directive that the parties are to share the costs of tree removal. Nor do the Prices present any substantive arguments challenging the award of costs, attorney fees, and expert fees payable to Kahn.

14

court denied the bifurcation motion, informing the parties it would consider the statute of limitations issue at the conclusion of Kahn's case in chief as allowed under section 631.8.[11]

At the close of Kahn's case, the Prices filed a section 631.8 motion for judgment on two grounds: (1) Kahn had failed to comply with the Ordinance's prelitigation procedural requirement of filing a tree claim that included "physical (i.e. visual) evidence" showing the existence of an unobstructed view from the main level of the residence before the growth of the tree, and the purported defect had not been remedied by the photographic and expert testimony presented by Kahn; and (2) the lawsuit was time-barred under section 338, subdivision (a).

The trial court denied the motion, specifically finding that Kahn had complied with the Ordinance's procedures and her tree claim was sufficient to meet the Ordinance's requirements. The court also found that, because the Ordinance required Kahn to comply with prelitigation procedures before filing her lawsuit, "under any reading of the statute of limitations," "the complaint could not be filed until the prerequisites to litigation had been satisfied." In its statement of decision, the court stated it had denied the section 631.8 motion for "the reasons stated on the record"; "[t]he Ordinance does not contain a statute of limitations"; and "[a]fter considering the pre-filing history, [the court] determined independently that Kahn met all pre-filing conditions and filed this case timely."

---

[11]    Section 631.8, provides in pertinent part, that "[a]fter a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment." (*Id*., subd. (a).)

15

Prior to trial the Prices also sought to have the court rule on their contention that the lawsuit was barred by laches, which the court said it would also consider at the close of Kahn's case pursuant to a section 631.8 motion for judgment. However, in their section 631.8 motion the Prices did not seek dismissal based on laches. Instead, at the conclusion of the case in its statement of decision the court found the lawsuit was not barred by laches based on a lack of evidence to support the defense. The court initially found Kahn had not delayed in asserting her rights. "In 2011, after a period of rapid growth, the tree significantly encroached into Kahn's view and she contacted [the former property owners], and offered to pay to remove the tree. Instead [the former owners] trimmed the tree. When Kahn learned that the Prices purchased the property, she contacted them in writing and in person – the procedures the Ordinance mandates as prerequisites to initiating a civil action. [Ord., section] 823. [¶] The Prices' responses to Kahn's requests justified her reasonable belief that, as neighbors, they could resolve the issue amicably and informally. The Prices, who were living in Hong Kong, and only visiting the . . . property occasionally, assured her that they would consult with their landscape architects. In late 2016 when it appeared informal resolution was unlikely, Kahn acted expeditiously, serving a tree claim in early 2017 and then engaging in mediation. When the mediation failed in late 2017, and the Prices declined arbitration, Kahn filed this case in early 2018. Kahn did not delay; she proceeded precisely as required by the Ordinance. [¶] There is no evidence that Kahn 'acquiesced' in the view obstruction. To the contrary, the Prices complain that she was insistent, persistent, and even aggressive in her efforts to remove the

16

view obstruction.  [¶] Nor is there evidence that the time from the Prices' ownership to trial was due to delay caused by Kahn or that it prejudiced the Prices.  To the contrary, it is Kahn who has been affected as her view has been obstructed as these proceedings are prolonged."

### B.    Analysis

### 1.    Statute of Limitations

We undertake an independent examination when reviewing whether a lawsuit is time-barred by any applicable statute of limitations.  (*William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1304.)  Moreover, "[i]f the *decision* of [the trial] court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion." (*Estate of Beard* (1999) 71 Cal.App.4th 753, 776; italics in original.)  Having made our de novo review, we conclude the action was timely filed albeit for a reason different from those given by the trial court.[12]

While the Prices recognize the Ordinance does not provide for a statute of limitations**,** they contend the lawsuit is nonetheless time-barred by various statute of limitations provided for in the Code of Civil Procedure.  However, we need not address these arguments as this lawsuit "meets the crucial test" for an action to abate a *continuing* nuisance for which any statute of limitations is inapplicable.  (*Aryeh v.*

---

[12]    Accordingly, we do not separately address the Prices' contention that the trial court made two "prejudicial errors of law" when it ruled that no statute of limitations applied because the Ordinance did not mention a limitations period, and Kahn filed this case timely because her delay in filing was due to her need to satisfy the Ordinance's prelitigation procedures.

17

*Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1197-1198 (*Aryeh*).)[13]  The Prices' arguments challenging the application of the continuous nuisance doctrine are unavailing.

We initially reject the Prices' argument that the continuous nuisance doctrine does not apply because "courts have generally declined to apply continuous accrual" rules to statutory causes of action.  The Ordinance does not contain a statute of limitations and is otherwise silent as to an accrual date for a lawsuit after prelitigation procedures fail.  In the analogous context of statutes, such silence "triggers a presumption in favor of permitting settled common law accrual rules to apply.  'As a general rule, "[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.  [Citation.]  'A statute will be construed in light of common law decisions, unless its language " 'clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter . . . .' . . . [Citations.]" [Citation.]' " ' [Citation.]" (*Aryeh, supra*, 55 Cal.4th at p. 1193; see *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290 ["[w]e interpret ordinances by the same rules applicable to

---

[13]     We reject the Prices' argument that Kahn "forfeited any right to rely" on the continuous nuisance doctrine by failing to properly raise the issue in the trial court.  As we have noted, during the course of litigating the pretrial motion for bifurcation, Kahn's opposition included a discussion that the continuous nuisance doctrine rendered any statute of limitations inapplicable.  When the Prices later renewed their statute of limitations argument in support of their section 631.8 motion, Kahn chose not to submit additional written opposition, but her counsel argued, among other things, that any statute of limitations was rendered inapplicable by the continuous nuisance doctrine.

18

statutes"].)  We thus may assume, in the absence of any specific provision in the Ordinance, that San Francisco intended the application of "the usual judicial rules governing accrual" to apply to a lawsuit filed under the Ordinance.  (*Aryeh*, *supra*, at p. 1193.)  In other words, the Ordinance is governed by common law accrual rules to the same extent as a statute.  (*Id.* at p. 1196.)

We also reject the Prices' arguments that the continuous nuisance doctrine cannot apply because they did not create a nuisance by having a tree on their property, California law does not impose nuisance liability for simple tree view obstruction, and the complaint does not allege a cause of action for nuisance.  It is true that under California law a landowner has no *common law* right to an unobstructed view over adjoining property and therefore nuisance liability does not lie for a view obstruction as a matter of common law. (*Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 635.)  However, at issue is a property owner's legal right to pursue a private action under the Ordinance, which was enacted under San Francisco's police power to resolve tree view obstruction disputes between adjoining landowners. (See *Kucera v. Lizza* (1997) 59 Cal.App.4th 1141, 1148-1149 [Town of Tiburon View and Sunlight Obstruction from Trees Ordinance upheld as a proper exercise of police power; " '[l]ocal government may . . . protect views . . . .' through the regulation of tree planting or growth"]).

The Ordinance specifically allows a complaining property owner to seek an abatement ("restoration") of a tree view "obstruction," which falls within Civil Code section 3479's broad definition of a "nuisance," i.e., "an obstruction to the free use of property, so as to interfere with

19

the comfortable enjoyment of life or property."[14]  We do not look at the label of the cause of action (violation of the Ordinance) or the failure to mention nuisance in the complaint, "but to the nature of the obligation allegedly breached."  (*Aryeh*, *supra*, 55 Cal.4th at p. 1200.)  Here, a tree owner's obligation under the Ordinance is based on a "nuisance theory" for "direct injury to [the complaining party's] property," i.e. view obstruction caused by a growing tree on adjoining property.  (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1136 (*Mangini*).)

---

[14]  The Civil Code also distinguishes between a public and private nuisance.  A public nuisance is defined as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."  (Civ. Code, § 3480.)  A private nuisance is defined as "[e]very nuisance not included in the definition of the last section."  (*Id.*, § 3481.)  The statutory definitions incorporate "the fundamental principle that a private nuisance is a civil wrong based on disturbance of rights in land while a public nuisance is not dependent upon an interference of rights in land but upon an interference with the rights of the community at large."  (*Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 124 (*Venuto*).)  While a public nuisance may be abated by any public body or officer authorized thereto by law, a private person may maintain an action for a public nuisance, if it is specifically injurious to himself, but not otherwise.  (Civ. Code, §§ 3493, 3494.)  If the nuisance may be considered both "private as well as a public one," "there is no requirement that the plaintiff suffer damage different in kind from that suffered by the general public and he 'does not lose his rights as a landowner merely because others suffer damage of the same kind, or even of the same degree.' "  (*Venuto, supra*, at p. 124.)  Here, the Ordinance is silent as to whether the tree view obstruction is to be considered either a public or private nuisance.  Because this appeal does not require us to decide whether a lawsuit under the Ordinance is one in the nature of a public or private nuisance, we do not further address the issue.

We also reject the Prices' contention that the continuous nuisance doctrine does not apply because the tree view obstruction was not a "continuing" nuisance, but rather "permanent" in nature. "Where a nuisance is of such character that it will presumably continue indefinitely it is considered permanent, and the limitations period runs from the time the nuisance is created. [Citation.] On the other hand, if the nuisance may be discontinued at any time it is considered continuing in character. [Citations.]" (*Phillips v. City of Pasadena* (1945) 27 Cal.2d 104, 107 (*Phillips*); see *id.* at p. 108 [where it appeared from complaint's allegations that locked gate could be removed at any time, the appellate court could not say, as a matter of law, that the locked gate constituted permanent nuisance; "[i]f the nuisance was in fact continuing in character, the claim was filed within time"].)

We have no difficulty in concluding that in this case the tree view obstruction constituted a continuous nuisance – "an encroachment which is not willful but unintentional, and which is abatable," as the law presumes such an encroachment will not be permanently maintained. (*Kafka v. Bozio* (1923) 191 Cal. 746, 751; see *Madani v. Rabinowitz* (2020) 45 Cal.App.5th 602, 608-609 ["the ' "crucial test of the permanency of a . . . nuisance is whether the . . . nuisance can be discontinued or abated" ' "; "[u]nder this test, sometimes referred to as the 'abatability test' [citation], a . . . nuisance is continuing if it 'can be remedied at a reasonable cost by reasonable means' "].) As the trial court found, even though the former owners had pruned the tree, the tree continually grew and by 2011 had substantially obstructed Kahn's views. The court specifically took note of the testimony of Kahn's arborist, as well as other percipient witnesses, that even after the

21

latest pruning in February 2019 there was no change in the obstructed views from the first level of Kahn's residence; and as explained by the arborist, " 'from the first level, [the pruning] opened up sky, none of the distant views.' "

Nor do we see any merit to the Prices' related assertion that the lawsuit is barred because the "wrongdoing, causation and injury arising from view obstruction were complete no later than 2011." "That is because the 'continuing' nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur." (*Mangini, supra*, 230 Cal.App.3d at p. 1147.) "Every repetition of a continuous nuisance is a separate wrong for which the person injured may bring successive actions . . . until the nuisance is abated, even though an action based on the original wrong may be barred." (*Phillips, supra,* 27 Cal.2d at pp. 107-108; see also Civ. Code, § 3483 ["[e]very successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by the former owner, is liable therefor in the same manner as the one who first created it"].)

Lastly, we are not persuaded by the Prices' argument that the application of the continuous nuisance doctrine will lead to inequitable results. Because the Ordinance is not "meant to replace the peaceful, sensible, and just resolution of differences between neighbors acting in good faith" (Ord., § 821, subd. (c)), its apportionment of costs appears to provide sufficient motivation for reasonable adjoining property owners to resolve their disputes without litigation. If a delay in bringing an action to restore obstructed views unreasonably impacts the rights of the tree owner, as the Prices contend, the court can handle that

22

circumstance under the equitable doctrine of laches.[15]  As we have noted, the trial court rejected the Prices' request to dismiss the lawsuit based on laches, and they have not challenged that ruling on this appeal.

In sum, we conclude Kahn's lawsuit was timely filed as the continuous nuisance doctrine rendered any statute of limitations inapplicable.  In light of our determination, we do not address the parties' other contentions.

### 2.    Ordinance's Prelitigation Procedures

In order to pursue either binding arbitration or a court action, a complaining party must prepare a written "tree claim," and serve the tree claim on the tree owner.  (Ord., § 823, subd. (c).)  Ordinance

---

[15]    As the record shows, the parties and the trial court proceeded on the basis that a lawsuit filed under the Ordinance could be defended against by laches.  In the absence of any arguments to the contrary in the appellate briefs, we proceed on the same assumption.  In any event, we note in passing that if the lawsuit were considered a claim to abate a private nuisance (see *Venuto*, *supra*, 22 Cal.App.3d at p. 124 [" '[t]he essence of a private nuisance is an interference with the use and enjoyment of land' "]), it can be defended against by laches (see *Felsenthal v. Warring* (1919) 40 Cal. App. 119, 129).  If the lawsuit were considered a claim to abate a public nuisance, concededly, as a general rule, it could not be defended against by either laches or the statute of limitations.  (See *City of Turlock v. Bristow* (1930) 103 Cal. App. 750, 756; Civ. Code, § 3490 ["[n]o lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right"].)  Albeit, under certain particular circumstances it has been held that laches may prohibit a public nuisance abatement cause of action where, after a "weighing process," the court has determined that the "injustice to be avoided was sufficient to counterbalance the effect of the defense upon a public interest."  (*City and County of San Francisco v. Pacello* (1978) 85 Cal.App.3d 637, 646 [appellate court concluded that under the particular circumstances therein the city and county's action to abate an alleged public nuisance was barred by laches].)

section 822, subdivision (j) (§ 822(j)) defines a "tree claim" as follows: A " 'Tree claim' shall mean the written basis for arbitration or court action under the provisions of this Article which includes the following: [¶] (1) The nature and extent of the alleged obstruction, including pertinent and corroborating physical evidence. Evidence may include, but is not limited to, photographic prints, negatives, or slides. Such evidence must show absence of the obstruction at any documentable time during the tenure of the complaining party. Evidence to show the date of acquisition must be included. [¶] (2) The location of all trees alleged to cause the obstruction, the address of the property upon which the trees are located, and the present tree owner's name and address. [¶] (3) Any mitigating actions proposed by the parties involved to resolve the tree claim. [¶] (4) The failure of personal communication between the complaining party and the tree owner to resolve the alleged obstruction as set forth in Section 823(a) of this Article. The complaining party must provide physical evidence that written attempts at reconciliation have been made and failed. Evidence may include, but is not limited to, copies of and receipts for certified or registered mail correspondence."

The Prices contend dismissal of the lawsuit is required because Kahn's prelitigation tree claim failed to include (1) "pertinent and corroborating physical evidence" in the nature of visual images showing an absence of an obstructed view from the main level of her residence before the growth of the tree, (2) "[e]vidence to show the date of acquisition" of the property by the property owner, and (3) "physical evidence that written attempts at reconciliation have been made and failed." The latter two categories of evidence were satisfied by the trial

24

court's admission of grant deeds showing Kahn had acquired the property in 1976 and continued to own the property and written correspondence showing "attempts at reconciliation have been made and failed."

As to the argument that the Ordinance requires a prelitigation tree claim to include corroborating physical evidence in the form of visual images showing no obstruction before the growth of the tree, nowhere does the Ordinance provide that the court is without jurisdiction to adjudicate a tree claim and must dismiss the action if the prelitigation tree claim fails to include such evidence. While the Ordinance requires the parties participate in prelitigation procedures before pursuing either binding arbitration or litigation, and a tree owner would be entitled to a stay of the action to compel compliance if a complaining party had not complied with the prelitigation procedures (see *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 255-256, 259), that does not mean that the trial court must dismiss a tree action if the prelitigation tree claim fails to include physical evidence of the absence of the obstruction before the growth of the tree.

Simply put, the Ordinance does not contain a clear intent "to limit the fundamental jurisdiction of *the courts*" to adjudicate only in those cases where the complaining party's prelitigation tree claim includes pertinent and corroborating evidence of the absence of an obstruction before the growth of the tree. (*Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 808 (italics added).) If there were an intent to "withdraw a class of cases from state court jurisdiction, we expect" the Ordinance would make that intention clear. (*Ibid.*) Instead, the Ordinance "makes no reference to the jurisdiction

25

of the courts, nor does it otherwise speak to the courts' power to decide a particular category of cases." (*Id.* at pp. 808-809.) Thus, we reject the Prices' argument that the trial court was required to dismiss the action for Kahn's failure to attach to her prelitigation tree claim visual images of the absence of the obstruction from the main level of her residence before the growth of the tree.

In the alternative, the Prices argue that dismissal is still required because Kahn did not "fill the physical evidence gap" at trial as she presented only testimonial evidence regarding there being an unobstructed view before the growth of the tree. We see no merit to this argument. At trial, the court must determine both "[t]he existence of landmarks, vistas, or other unique features which cannot be seen because of growth of trees since the acquisition of the property" (Ord., § 824, subd. (a)(4)), and the degree to which the "alleged obstruction interferes with [the] view . . . by means of a measuring instrument or photography" (*id.*, § 824, subd. (a)(5)); and, further, "[t]he extent of . . . view available and documentable as present at any time during the tenure of the complaining party is the limit of restorative action which may be required" (*id.*, § 824 (c)(6)). However, these provisions do not impose a specific evidentiary requirement on the complaining party to produce visual images of the absence of obstruction *before the growth of the tree*, as the Prices suggest.

Moreover, even assuming the need for photographic evidence, the trial court's findings based on the above enumerated criteria – that Kahn had enjoyed unobstructed views from the main level of her home before the growth of the tree – is supported by both Kahn's testimonial evidence and her arborist's testimony regarding the absence of the

26

obstruction before the growth of the tree based on an evaluation of the available historic photographs taken from the second level of the residence and the current partial view obstructions from the main level of the residence. (See fn. 8, *ante*.) The trial court, as the trier of fact, could properly combine the arborist's testimony with its own on-site observations and the testimonial evidence of Kahn and her witnesses regarding the absence of the obstruction before the growth of the tree, " 'thus weaving a cloth of truth out of selected available material.' " (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68.)

In sum, we conclude the trial court was not required to dismiss the action predicated on Kahn's failure to include in her prelitigation tree claim visual images of unobstructed views from the main level of her residence before the growth of the tree. Given this conclusion, we need not address the Prices' additional evidentiary arguments.

## II.    Trial Court's Order Directing Tree Removal

Ordinance section 824, subdivision (c), describes the restorative action that may be ordered by a court: "(1) Restorative actions may include written directions as to appropriate timing of trimming, thinning, topping, or removal. Such restorative actions are to apply only to current parties to the agreement. . . .[¶] Possible restorative actions may include (i) no action, (ii) trimming, (iii) thinning, (iv) delayed trimming or thinning, (v) topping, or (vi) removal with possible replacement plantings. [¶] (2) Restorative actions shall be limited to the trimming and/or thinning of branches where possible and practical. Trimming or thinning may be on a delayed basis, providing time for the top of the tree to grow above the point where it obstructs sunlight or view. [¶] (3) When trimming and/or thinning of branches is not a

27

feasible solution, the impact on the health of the tree shall be considered before topping is required. [¶] . . . [¶] (6) The extent of . . . view available and documentable as present at any time during the tenure of the complaining party is the limit of restorative action which may be required. [¶] . . . [¶] (8) A tree which has been the subject of restorative action under the terms of this ordinance is exempted from other property owners' claims for a period of five years from the date of the filing of a tree claim."

In its statement of decision, the trial court explained how the tree's removal was the only reasonable solution given that the following options were not feasible: (1) leaving the tree in the Prices' exclusive control for them to have trimmed as they deemed appropriate would not work as the evidence demonstrated their hostility and indifference; (2) allowing the Prices to prune the tree to its February 2019 height would in no way restore the previously unobstructed views; and (3) allowing the tree's height to be "gradually reduced . . . to the level of the [top of the] Prices' home" could destroy the tree according to both arborists. In addition, to maximize the chances of the tree's survival, the reduction of the tree could not be done at one time but could take "as long as eight years – depending on the tree's response – before it could be reduced to the desired height and breadth," and the parties' "fractious history" would make it unlikely they would agree to "the desired height for each pruning cycle." Also, a progressive reduction of the tree's height would result in its growth being "redirected laterally," and "[w]hile the vertical obstruction would remain in place for as long as eight years, during that same time the lateral obstruction would actually increase, further diminishing Kahn's views." Nor would

progressive pruning "achieve either side's objectives. It would take years to restore any semblance of the Kahn home's historic views. And were that objective achieved, the Prices would lose what they claim to value about the tree: both its current aesthetic appearance and the partial screening of the upper floors of the Kahn home." The court also considered the potential impact on neighboring properties as "[a]mong the Ordinance's purposes is the promotion of 'the aesthetic and practical benefits' provided by trees to 'the entire community' " and a grant of restorative action would "limit other neighbors' ability to seek restorative action . . . 'for a period of five years.' "

The court concluded that "[t]rimming the tree to the height of the [top of the] Prices' home pose[d] insurmountable hurdles. To avoid cutting the tree so drastically as to threaten its survival, according to the experts, the pruning would have to occur over many years. And even that may contribute to the death of the tree. These parties who have been unable to communicate, much less agree, would be forced into decision-making at least annually. The [neighbors] would be precluded from seeking relief if the topping of the tree results in lateral growth that is more intrusive on their views. And if this method succeeds, while the views may ultimately be restored, the tree would be unrecognizable as a Monterey pine."

Thus, the court found that the only option to "best achieve[] the Ordinance's objectives" was the tree's removal. While noting the Ordinance's purpose was " '[t]o discourage ill-considered harm to, or destruction of, trees . . . .,' " the court found removal would promote " 'the aesthetic and practical benefits which trees provide for individuals and the entire community," in that the tree had "limited aesthetic

value, which would be diminished by the trimming necessary to restore even a portion of the historic views," the tree did not benefit the " 'entire community,' " and to the extent it benefited the Prices it did so by unreasonably burdening Kahn and a neighbor.

The court also found the tree's removal was appropriate "because it will provide finality to the parties. The alternative – trimming and topping – would have assured constant strife, with untold expense to the parties. The Ordinance is not intended 'to replace the peaceful, sensible, and just resolution of differences between neighbors acting in good faith.' . . . But where, as here, seven years have been consumed by discord between the parties, judicial intervention is required. Removal of the tree will end this dispute. [¶] [The court] considered whether to order replacement plantings as part of the 'restorative action.' Because the plantings would benefit the Prices, and presumably not be visible to Kahn, [the court left the] decision to the Prices, as the parties have demonstrated an inability to confer, much less to agree, on anything horticultural."

Despite the Prices' attempt to couch their argument in terms of legal error, we review the court's decision for an abuse of discretion. "It is the general rule in this state that while the right to injunctive relief under proper circumstances is well established, its issuance is largely discretionary with the court and depends upon a consideration of all the equities between the parties. No hard and fast rule can be adopted which will fit all cases and hence each must be determined upon its own peculiar facts." (*Pahl v. Ribero* (1961) 193 Cal.App.2d 154, 161.) "The discretion was the trial judge's, not ours; and we can only interfere if we find that under all the evidence, viewed most favorably

in support of the trial court's action, no judge could reasonable have made the order that he did." (*Newbauer v. Newbauer* (1949) 95 Cal.App.2d 36, 40.)

A statement of decision "need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision. [Citations.] '[A] trial court rendering a statement of decision under . . . [Code of Civil Procedure] section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them.' " (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.) Further, while the expert arborists' testimony could not be arbitrarily or unreasonably disregarded, the court was free to draw inferences and conclusions at odds with that testimony. (See *Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 170-172 ["expert testimony," even if uncontradicted, does not "exclude consideration of other facts which are pertinent to the issue involved"].) Hence, the Prices' assertion that the trial court had to expressly reject or make credibility findings as to the testimony of the expert arborists is without basis.

We also see no merit to the Prices' arguments that tree removal was barred because "[a] tree must be given a feasible chance to survive if its owners so desire – and they do so desire in this case," and the Ordinance "decrees *delayed* pruning of trees *over time* to fulfill the interests of *both* property owners *and* their neighbors seeking view restoration." The Ordinance's primary purpose is to create a mechanism to adjudicate the rights of any property owner "who wishes

to alter or remove a tree on the property of another which creates an obstruction to his or her access to sunlight or view." (*Id.*, §§ 821, subd. (a)(1); 822, subd. (b).) Kahn's views from the main level of her residence remained *continuously* obstructed even after the trimming and thinning of the tree on a "delayed basis" (i.e. periodic pruning) done by the Prices. Thus it was clear that such periodic pruning would not be a feasible solution as it would never restore the obstructed views. Also, we see no merit to the Prices' complaints that the trial court improperly considered the testimony of an immediate neighbor who testified at trial. The Ordinance does not preclude the court's consideration of an immediate neighbor's interest and, indeed, the provisions concerning "[c]ommunity [b]oard [m]ediation" specifically state that the "[p]arties should be encouraged to give notice to immediate neighbors and solicit input." (Ord., § 832, subd. (b).) Of course, the bar on another claim for restorative action regarding the same tree for a period of five years made it especially important to consider any particular restorative action as it might affect an immediate neighbor.

In sum, the Prices have simply presented " 'a state of facts, a consideration of which, for the purpose of judicial action, merely affords an opportunity for a difference of opinion. An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " (*Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1449.) The Prices' "elaborate factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to [them] at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982)

32

32 Cal.3d 388, 398-399 (*Hasson*).) Because we find no abuse of discretion in this case, we must uphold the court's decision to remove the tree.

## III. Trial Court's Imposition of Section 128.5 Sanctions

### A. *Relevant Facts*

#### 1. Background

After the parties completed their trial presentations, the court verbally provided a tentative decision from the bench largely in favor of Kahn on the substantive issues, but leaving open the question of the appropriate remedy. At that point, the parties agreed to mediation with another judge. The parties engaged in judicial mediation on July 11 and agreed to reconvene September 13 to report their progress to the trial court.

In the interim, the Prices, by their trial counsel William S. Weisberg (Weisberg) of Weisberg & Miller (hereafter also collectively referred to as appellants), filed a motion to dismiss or for judgment on the pleadings regarding Kahn's lack of standing to pursue her lawsuit (standing motion) because her San Francisco residence was not her "primary residence." The motion's factual predicate was Kahn's recorded 2008 Florida declaration of domicile in which she declared that, as of January 2008, her domicile and legal residence was in Florida. It was also asserted that she had a bank loan, secured by a deed of trust, which required her San Francisco residence to be her "primary residence." Because Kahn could only have one "primary residence," the Prices opined that once the Bank learned about Kahn's Florida declaration it would foreclose on the San Francisco residence, making the Bank the owner and the only one with standing to assert a

33

tree claim under the Ordinance. The Prices' memorandum of points and authority included a footnote that Weisberg had served a copy of the standing motion on the Bank because it had "an interest in . . . knowing what misrepresentations were made by [Kahn]," and for the Bank's "possible action relating to the factual basis put forth in this [m]otion."

Kahn opposed the standing motion, taking particular note of the fact that Weisberg had served the standing motion papers on the Bank, a stranger to this litigation in order to interfere with Kahn's personal and financial affairs. Kahn also filed a declaration explaining that she had received a line of credit with the Bank in 2010 secured by a deed of trust. She asserted that in an annual certification that the San Francisco residence was her primary residence, she truthfully certified she " '[c]urrently' " lived in the property, she had not been " 'absent from the property due to mental and/or physical illness for more than twelve (12) months,' " and she had not " 'sold the property or conveyed title to the property.' " Kahn further advised the court and the Prices that the mediation would not proceed and she would prepare and serve a " 'safe harbor' " motion for sanctions under sections 125.8 and 125.7 for the filing of a frivolous standing motion.

At the October 7 hearing on the standing motion, counsel for the Bank appeared via Court Call. Before the hearing, counsel sent an email to the court stating that the Bank "is the investor on a reverse mortgage loan on the property of [Kahn]. Counsel for [the Prices] has contacted us and asked we attend as there are some issues re: how [the bank might] respond to certain arguments [the Prices] may be advancing as to the standing of the borrower, specifically the

34

implications of taxation and residency." Kahn's counsel advised the court she had no prior knowledge that Weisberg had actually contacted the Bank or its counsel.

The trial court denied the standing motion. After taking judicial notice of the Bank's deed of trust and Kahn's Florida declaration of domicile, the court rejected any contention that those documents would permit a finding, as a matter of law, that Kahn did not have standing to sue because the San Francisco property was not her primary residence. More significantly and dispositive, the court found that "the sole prerequisite for a complaining party to bring suit under the Ordinance" was status as the property owner, and, at the time of filing the complaint and at the time of trial "Kahn was, and currently is, the property owner with standing."

The court further noted the Prices did not dispute that Kahn's "recorded grant deed – admitted into evidence – identified [her] as the owner of the [San Francisco] property. They . . . rely on a provision of [the Bank's] deed of trust which they contend is in default because Kahn's domicile is Florida and therefore the [San Francisco] property is not her principal residence as required by the deed of trust. The Prices proceed from the alleged deed of trust default to the proposition that the lien holder, [the Bank], is the property owner and therefore the only party with standing to assert claims under the Ordinance." However, the court found the Prices had not offered any legal authority for their "novel legal theory that a lien holder with a potential, but unasserted, default claim is the property owner."

Kahn then filed a motion for sanctions under sections 128.5 and 128.7 based on the filing of the standing motion itself and appellants'

35

serving the Bank in order to "harm . . . Kahn's relationship with her lender and interfere with her finances. If there was any doubt about that, [the Prices] strongly signaled in their motion that they hoped [the Bank] would foreclose on . . . Kahn as a result of [the Prices' standing motion]. . . . [S]uch actions would arguably be tortious in another context, but by using the process of the Court as the vehicle for their . . . interference, [the Prices] have cloaked their conduct in the litigation privilege. That gambit may save them from a claim for damages, but it shall not save them from sanctions."

Kahn asserted that, even at the time she filed her motion for sanctions, her counsel did not know "the lengths" to which appellants had gone to try and hurt her. "Out of the blue, on November 6, 2019, . . . Kahn received a Notice from [her loan service provider]. . . advising she was 'at risk of foreclosure' for not satisfying the occupancy requirements [of the loan]. When [Kahn's counsel] contacted [the loan service provider] . . . it was revealed that on September 20, 2019, *just five days prior to the hearing on the Standing Motion*, a '**William Weisberg**' telephoned [the loan service provider] and advised them that [Kahn's residence] was **'vacant.'!** . . . As the Court knows, this was a false statement and it could only be intended to disrupt . . . Kahn's home ownership and her life." (Bolding and italics in original.) The Prices opposed the sanctions motion and filed their own motion for sanctions against Kahn and her trial counsel for filing a frivolous sanctions motion.

On December 17, 2019, the trial court held a hearing on the parties' competing sanctions motions. In response to questions from the court, Weisberg stated he had not spoken with the Bank's counsel,

36

but had contacted the Bank's loan service provider and its counsel and had sent the loan service provider a copy of the standing motion. The court found the standing motion misrepresented the facts of Kahn's occupancy of her San Francisco residence and allowed Kahn to amend her sanctions motion to add Weisberg's newly-reported conduct with Kahn's loan service provider and counsel as further grounds for an award of sanctions.

Accordingly, three days later, Kahn filed and served an amended motion for sanctions under section 128.5. In support of the amended motion, Kahn's counsel submitted a copy of Weisberg's September 20, 2019 email to counsel for the loan service provider. The email included three attachments pertaining to the standing motion: (1) the Prices' memorandum points and authorities; (2) their request for judicial notice; and (3) Kahn's "declaration." In the September 20, 2019 email, Weisberg stated, in pertinent part (bolding and italics in original):

"I am attaching the relevant pleadings which we discussed.

"In summary, in 2010 . . . Kahn (Plaintiff in our action) took out a massive reverse mortgage . . . with [the Bank]. (Attached to our Request for Judicial Notice[.])

"The law and the Security Agreement at paragraph 5 reads: '*Borrower [i.e. Plaintiff] shall at all times occupy, establish, and use the Property as the Borrower's* **principal residence. . . . Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to the Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Loan Agreement, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence**.'

*"The Borrower, however, certified and recorded in the State of Florida that in 2008 (**2 years before this loan**) and by her testimony, continuing until the present that; I was **formerly a legal resident San Francisco, CA** and I resided **[past tense]** at [a specified San Francisco address]. However, I changed my domicile to and am since 2d day of Jan., 2008, reside at [specified address in Florida][.] She went on to certify that 'I have no intention to further return to my **former domicile** and intend to remain in [specified city in Florida][.]'* [¶] . . . [¶]

"It appears evident to us that the Borrower here provided false and inaccurate information to the lender from the inception of this loan (and to your client, the [loan service provider] since 2012) with respect to her primary residence. It is obvious to us that one cannot claim principal or primary residence in Florida to avoid California State tax obligations and claim principal or primary residence during the same period in California to obtain this loan.

"It is telling that the opposition presented by the Plaintiff to our motion, which is heavy on procedural objections and hyperbole, never refutes the facts above. Her declaration suggests that she fills out a form provided to her by [the loan service provider] which simply asks her if she 'currently lives in the property', and while she admittedly visits the property annually she believes (subjectively) that this satisfies the 'primary residency requirement' of the loan to your client's and [the Bank's] satisfactions. She never indicates that you or [the Bank] have ever been provided with the certification of her Florida primary residency requirement.

"I would suspect that your client has an interest in these facts. Not only because it is our belief that the right to call the note has been triggered and is incurable, but the action taken by the Plaintiff (requesting the removal of a tree on our clients' downhill [sic] property) will, in the opinion of our geotechnical engineers would [sic] greatly destabilize the hillside or backyard of the Plaintiff's (borrowers' [sic]) property and resulting in great damage – not only to the secured property of the Borrower but to our Clients as well. If that issue is of interest to you I would be pleased to offer to present [sic]."

Kahn's counsel also submitted a December 18, 2019 letter from the loan service provider's Correspondence Department sent in response to communications sent by Kahn's counsel on November 11, November 19, November 25, and December 13, 2019. The letter stated, in pertinent part, as follows:

". . . As you may know, the referenced loan is a California Senior Equity Reserve Mortgage Platinum ('Platinum') Loan. Under Platinum terms if the property ceases to be the principal residence of the borrower, the loan becomes immediately due and payable.

"[The loan service provider] received a telephone call from William Weisberg on September 20, 2019 who advised that the property was a residence of Ms. Kahn, but not her primary residence. [The loan service provider] began the default process at that time to ensure that required timelines were met and to investigate the claim he made. [The loan service provider] had not sent any notices prior to this notification as the request for certification of occupancy is sent annually.

"[The loan service provider] attempted contact with Ms. Kahn on September 23, 2019 via telephone. Someone answered, but hung up when the representative was providing required disclosures. [The loan service provider] then attempted to contact [Kahn's relative], who is listed as an authorized alternate contact, and left a voice mail message. [The loan service provider] did not receive return calls. As a result [the loan service provider] sought and obtained approval from the lender to proceed to call the loan due and payable.

"On October 23, 2019 [the loan service provider] mailed the enclosed reverse Mortgage Due and Payable Notice to Ms. Kahn via regular and certified mail. [The loan service provider] also requested an inspection of the property in an attempt to determine occupancy. A copy of the property inspection invoice is enclosed.

"Upon receipt of your fax dated November 8, 2019 [the loan service provider] initiated the process to rescind the due and payable action. The due and payable process was immediately placed on hold. Notification was provided to the [loan service provider] Occupancy

39

Department who then requested additional documentation to fully establish Ms. Kahn's continued occupancy of the property as her primary residence.

"When [the loan service provider][sic] the signed occupancy certification and the utilities bills, the due and payable action was stopped and the loan status changed to Active. [The loan service provider] regrets the confusion created by this situation."

Appellants opposed the amended motion for sanctions.

## 2. Order Granting Section 128.5 Sanctions

The trial court granted Kahn's amended motion for section 128.5 sanctions. In pertinent part, the court stated it did not have to rely on the request for sanctions under section 128.7 for the filing of a frivolous standing motion "to afford Kahn her well-deserved relief" because it was granting Kahn's request for sanctions under section 128.5, subdivision (a), based on appellants' " 'action or tactics,' " which the court found were " 'made in bad faith,' " and were " 'frivolous or solely intended to cause unnecessary delay.' "

The court went on to note that while its denial of the standing motion was "sufficient to justify a sanctions award to compensate Kahn for the cost of opposing the specious motion," "the evidence of Weisberg's conduct vis a vis [the Bank and loan service provider] compels a harsher remedy. [¶] Not only did Weisberg misrepresent Kahn's occupancy to her lender and its loan service provider, but without a factual or legal basis, he urged the lender to call the note and argued that the default was 'incurable.' As if that were not sufficient, Weisberg misrepresented the geotechnical engineering evidence which [the court] heard at trial. There was no credible evidence that the remedy [the court] ordered – if implemented as advised by the experts –

40

would 'greatly destabilize the hillside or backyard of [Kahn's property] . . . and result[ ] in great damage – not only to the secured property of [Kahn] but to [the Prices].' Frustrated by the outcome of the trial over the removal of a lone Monterey pine tree, [appellants] sought to trigger a mortgage default and possibly foreclosure proceedings on the home Kahn occupied since the 1970s, and all because she invoked a San Francisco ordinance to get a judicial determination of her rights."

The court specifically found that "the motivation for filing the standing motion was to delay the finality of the judgment and to improve the Prices' settlement bargaining position. [The court did not] know the details of the mediation, but filing the motion on September 3, ten days before the resumption of the mediation allows the inference that [appellants'] intent was to retaliate against Kahn in the misguided hope that she would settle on their terms to avoid damaging her relationship with her lender. As is evident from Weisberg's call which he confirmed in the September 20 email, when their effort at intimidation failed, the Prices sought to punish Kahn by encouraging the lender to declare a default, and – for a limited time – they succeeded. [Appellants'] . . . relentless pursuit of their objective to thwart the court's ruling and Kahn's rights is evident from a brief review of the chronology.

"On September 3 – with the mediation to resume on September 13 – [the Prices] served the standing motion on [the Bank], a nonparty with no interest in the case, and included the Bank on the proof of service, presumably to signal their intent to Kahn. Not content with putting the Bank on notice, Weisberg contacted [the Bank's] legal counsel . . . requested and secured his appearance at the hearing.

"When it appeared [the] Bank . . . would not do his bidding, Weisberg contacted . . . [the loan service provider] and its counsel, by phone and with the September 20 email (which accused Kahn of 'committing criminal loan fraud'), and sent the standing motion, but not [Kahn's] opposition which refuted [the Prices'] inaccurate statements. The September 20 email recites in bold and italicized font the occupancy requirements of [Kahn's] reverse mortgage and claims that '[Kahn] provided false and inaccurate information to the lender' because she had filed a declaration of domicile in Florida prior to obtaining the loan. Weisberg then argues: 'It is telling that the opposition presented by [Kahn] to our motion, which is heavy on procedural objections and hyperbole, never refutes the facts above. Her declaration suggests that she fills out a form provided to her by your client which simply asks if she "currently lives in the property," and while she admittedly visited the property annually she believes (subjectively) that this satisfies the "primary residency requirement" of the loan to your client's and [the Bank's] satisfaction.' " [¶] The suggestion that Kahn 'visits' – as opposed to occupies – her home was patently false. Not only were there pre-trial site inspections at both properties attended by defendants' counsel and experts, and [the court's] site inspection with the Prices and their counsel, but a principal argument for retaining the tree was that it shielded the Prices and their children from constant observation of their home by Kahn. When [the court] questioned Weisberg about his 'visits the property annually' statement, it was clear that his prevarication had been discovered, and he had no explanation. [¶] Perhaps underestimating Kahn's counsel, Weisberg assumed that he could

42

instigate the default and not be held responsible for his actions. Not content to rely solely on his misrepresentation of Kahn's occupancy, Weisberg sought to strengthen his position by arguing – contrary to the evidence – that removal of tree would destabilize both properties. Fortunately for Kahn, her lawyer was not deterred. She not only rescued the property but provided the evidence the court needed to address the Prices' and Weisberg's transgressions."

The court therefore found that "[t]he prerequisites for providing relief pursuant to section 128.5 are justified by the extraordinary actions – both in and outside the court – undertaken by the Prices and Weisberg. The standing motion was frivolous, intended to cause unnecessary delay, and filed in bad faith. However, the motion was merely the overture for the bad faith conduct which followed: the effort to precipitate a default on the reverse mortgage, which was only avoided by the valiant efforts of Kahn's indomitable counsel. That the Prices and Weisberg possessed an 'evil motive' is obvious, that they pursued it so blatantly is astonishing." Thus, as a result of appellants' "conduct – which included false statements and unsupportable legal claims – the lender and its service provider issued a notice of default on the reverse mortgage on Kahn's residence. In response Kahn incurred legal fees and costs to undo the harm done by [appellants'] extraordinary misconduct."

The court awarded sanctions in the requested sum of "$47,345.30 as the total [Kahn] incurred in fees, costs, and expenses to address the standing motion and to counter the misconduct" of appellants. Having considered the circumstances, and after reviewing the record after the hearing, the court concluded the full amount requested was justified:

"At the hearing [the court stated its] tentative decision to reduce the amount by $7,457.75 – the amount attributed by [Kahn] to participating in the judicial mediation following trial. However, the evidence adduced in the sanctions motion when reviewed in its totality leads inescapably to the conclusion that [appellants] used the mediation as a delay tactic to afford counsel the opportunity to file the standing motion. . . . [The court] encourage[d] parties to use the court's judicial mediation program – which provides confidential alternate dispute resolution at no cost – but where, as here, it was used as a tool to further the strategy of obstruction, [Kahn] should not bear the cost of participation."

The court also considered how to allocate the sanctions, and "concluded from the evidence at trial – based in part on [Katherine] Price's emails to third parties – and the post-trial conduct described in this order that the sanction should be awarded against [appellants]," and that while the court could allocate the award against defense counsel only, it found defense counsel's "actions and tactics were not only known by [the Prices] but were authorized by them as well."

The court ordered sanctions in the sum of $47,345.30, to be paid by appellants, jointly and severally, to compensate Kahn for the attorney fees and costs that she incurred to "oppose the standing motion and defendants' sanctions motion, to present [sic] plaintiff's sanctions motion and to undo the notice of default on her home." [16]

---

[16] We assume the trial court and attorney Weisberg have already reported the judicially imposed sanctions to the State Bar of California. (Bus. & Prof. Code, §§ 6068, subd. (*o*)(3) [attorney self-reporting duties]; 6086.7, subd. (a)(3) [court reporting duties].)

### B. Analysis

Appellants present extensive argument directed at Kahn's initial sanctions motion, contending the motion was not in compliance with the "safe harbor provisions" of sections 128.5, which was a structural error requiring reversal as a matter of law. However, section 128.5's " 'safe harbor provisions' " are applicable only where sanctions are sought for "frivolous pleadings" that can be withdrawn or appropriately corrected. (§ 128.5, subd. (f)(1)(B),(D); see *In re Marriage of Sahafzadeh-Taeb & Taeb* (2019) 39 Cal.App.5th 124, 147 [safe harbor provisions "allow time for the withdrawal of frivolous pleadings"].) Here section 128.5's "safe harbor" provisions were not applicable as the court did not award sanctions for the failure to withdraw the standing motion, but for appellants' bad faith conduct and tactics in sending factually misleading and legally unsupportable communications to the Bank and loan service provider with the sole intent to harass Kahn and unnecessarily delaying the court proceedings. We therefore reject appellants' reliance on Kahn's purported lack of compliance with section 128.5's safe harbor provisions.

We see no merit to the remainder of appellants' numerous arguments, beginning with their assertion that the court erred in denying the Prices' standing motion and therefore sanctions could not be granted. The trial court correctly found Kahn had standing to pursue an action as the evidence admitted at trial satisfied the only standing requirement – that the "complaining party" be the "property owner." (Ord., § 822, subd. (b).) Even if Kahn had never occupied or resided in the property, she was still the property owner by virtue of the grant deeds and had standing to pursue an action.

45

Next, appellants are incorrect in stating that the trial court analysis of defense Weisberg's September 20, 2019 email was factually unsupported and legally erroneous.  The court's interpretation of the email and the inferences to be drawn from it were not based solely on the language in the email, but also on Weisberg's responses to the court's questions concerning certain statements in the email, which the court found to be not credible.  Appellants' "elaborate factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to [them] at the trial level, contrary to established precepts of appellate review.  As such, it is doomed to fail." (*Hasson, supra,* 32 Cal.3d at pp. 398-399.)

There is likewise no merit to appellants' argument that Kahn did not prove she incurred any expenses as a result of the communications.  Based on Weisberg's September 20, 2019 email, the loan service provider's December 18, 2019 letter, and the declarations of Kahn's counsel, the trial court could and did find that, absent defense counsel's communications, neither the Bank nor the loan service provider would have made any inquiry regarding the loan in the first instance.  The trial court was free to reject appellants' contentions that no sanctions were warranted because a default notice would not have issued had Kahn responded to the loan service provider's initial telephone inquiries, the actions of the Bank and loan service provider were "superseding" causes of any expenses Kahn may have incurred based on the issuance of the default notice and its withdrawal, and/or Kahn failed to provide documentary "evidence of her interactions with the bank preceding its decision not to proceed with foreclosure."

46

Appellants attempt to argue that Weisberg's communications with the Bank and loan service provider were not sanctionable as they were outside of civil litigation. This argument is both forfeited for appellate review as it is now raised for the first time and has absolutely no merit. Defense counsel's factually misleading and legally unsupportable communications were without question made in the course of the litigation and the court in no way abused its discretion in finding they were made to harass Kahn and unnecessarily delay entry of judgment in her favor. We are not persuaded otherwise by appellants' citations to portions of the legislative history of section 128.5 or the factually distinguishable, and therefore inapposite, cases of *County of Imperial v. Farmer* (1988) 205 Cal.App.3d 479, *Rabbitt v. Vincente* (1987) 195 Cal.App.3d 170, and *Optimal Markets, Inc. v. Salant* (2013) 221 Cal.App.4th 912. Nor do we see any merit to appellants' argument that upholding the award of sanctions in this case constitutes a violation of appellants' constitutional rights to free speech and due process and would otherwise have "monumental adverse consequences for legal rights and public policies."

In a similar vein, appellants contend section 128.5 sanctions cannot be awarded to Kahn for any expenses incurred to "undo the notice of default on her home" because those sums were not incurred as a result of actions or tactics *in litigation* – rather, they were incurred as a result of having to address a default in her loan in a private transaction between Kahn and the Bank outside of litigation. According to appellants, the sanctions were in the nature of "consequential damages," which are not permissible under the

47

authority of *Brewster v. Southern Pacific Transportation Co.* (1991) 235 Cal.App.3d 701 (*Brewster*). We disagree.

The appellate court in *Brewster* held that the trial court had no authority to impose section 128.5 sanctions against an individual attorney in order to compensate the plaintiff railroad for lost profits after counsel served a false temporary restraining order that caused the railroad to stop operating trains. (*Brewster*, *supra*, 235 Cal.App.3d at pp. 707, 710.) When the railroad learned there was no temporary restraining order, it filed a motion for sanctions, seeking to recover $139,000 in consequential damages for the financial loss caused by the wrongful stopping of the trains, plus related attorney's fees attributed to calculating the financial loss, which the trial court granted. (*Id.* at p. 711.) The Court of Appeals reversed, not because section 128.5 sanctions were limited to attorney fees and costs, but because the consequential damages and related attorney fees to document the financial loss were "unrelated to the cost of the actual proceedings before the court." (*Brewster*, *supra*, at pp. 710-711, 716.) The court noted that allowing such an award in the nature of sanctions would relieve the railroad of its "obligation to file a civil suit for damages against [the attorney] to recover the cost of rerouting [its] trains." (*Id.* at pp. 711, 716.)

Unlike in *Brewster*, here the sanctions were warranted to compensate Kahn for reasonable expenses (attorney fees and costs) directly related to appellants' bad faith tactics in the litigation, and to compensate her for those expenses to mitigate appellants' misconduct. Hence, the sanctions awarded in this case are "more closely related" to the litigation than the consequential damages and related attorney fees

48

at issue in *Brewster*. (*Tenderloin Housing Clinic, Inc. v. Sparks* (1992) 8 Cal.App.4th 299, 307-308 (*Tenderloin Housing Clinic*) [rejecting reliance on *Brewster*, appellate court upheld an award of sanctions for "reasonable expenses" to reimburse for lost vacation time and airfare expenses that defendants' counsel was required to pay when she had to cut short her vacation to attend depositions that were scheduled in violation of parties' stipulations]; *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 9, 27-28 [appellate court upheld an award of sanctions to compensate a corporate party for the cost of time spent by corporate personnel in defending a meritless cross-complaint].) Because we hold the expenses (attorney fees and costs) incurred by Kahn to "undo the default notice on her home" caused by appellants' bad faith actions and tactics were properly awarded as section 128.5 sanctions, we reject appellants' additional claim that such sums should have been adjudicated in a separate civil suit. (*Tenderloin Housing Clinic*, *supra*, 8 Cal.App.4th at p. 308.)[17]

## DISPOSITION

Case No. A159536. The appeal from the judgment, filed December 2, 2019, is dismissed.

Case No. A160057. The appeals from the orders, filed February 25, 2020 and February 26, 2020, are dismissed. The amended judgment, filed February 26, 2020, is affirmed.

Plaintiff and respondent Linda Kahn is awarded costs on appeals in case No. A159536 and case No. A160057.

---

[17] In light of our determination, we do not address appellants' other contentions.

49

_____

Petrou, J.



WE CONCUR:



_____

Fujisaki, Acting P.J.



_____

Chou, J.*



*Kahn v. Price et al.*/A159536 A160057

_____

\*     Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        San Francisco County Superior Court

Trial Judge:       Hon. Jeffrey S. Ross

Counsel:           Bonapart & Associates, Barri Kaplan Bonapart; Bien & Summers, Eilliot L. Bien, for Plaintiff and Respondent.

Law Offices of Tony J. Tanke, Tony J. Tanke; Weisberg & Miller, William S. Weisberg, for Defendants and Appellants.